**IN THE UNITED STATES DISTRICT**
**COURT FOR THE EASTERN DISTRICT OF**
**PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSE RAMON SILVA MEDINA** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ANDREW SAUL,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant.** | : | **NO.   19-4112** |
| | : | |

**MEMORANDUM OPINION**

**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**

Plaintiff Jose Ramon Silva Medina ("plaintiff") brought this action under 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("defendant") denying plaintiff's claim for Disability Insurance Benefits ("DIB") under Title II of the Act. Presently before this court are plaintiff's request for review, defendant's response, and plaintiff's reply.  In accordance with 28 U.S.C. §636(c), Fed. R. Civ. P. 72, and Local Rule 72.1, consent to the exercise of jurisdiction by a Magistrate Judge has been established.  For the reasons set forth below, plaintiff's request for review is **DENIED**.

**I.      FACTUAL AND PROCEDURAL HISTORY**

Plaintiff is a thirty-five-year-old man born on September 6, 1984.  (Tr. 52).  The highest grade plaintiff completed in school was Eighth Grade.  (Tr. 53).  Plaintiff has past relevant work as a construction laborer and a heavy equipment operator.  (Tr. 27).

On October 20, 2016, plaintiff filed an application for DIB. (Tr. 15). Plaintiff's alleged disability onset date was October 5, 2015. (Tr. 17). Plaintiff's application for DIB was denied at the state level on April 25, 2017. (Tr. 15). Plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ").

On December 20, 2018, ALJ Theodore Burock held a hearing. (Tr. 36). The ALJ issued an opinion on April 11, 2019, finding plaintiff not disabled under the Act from October 5, 2015, through the date of the ALJ's decision. (Tr. 29). Plaintiff filed a request for review and on July 9, 2019, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 2-5).

On September 9, 2019, plaintiff initiated the present action. Plaintiff argues that the ALJ failed to properly evaluate plaintiff's obesity and failed to include certain limitations in plaintiff's residual functional capacity assessment. For the reasons discussed below, plaintiff's request for review is DENIED.

## II.    LEGAL STANDARDS

Upon judicial review, this court's role is to determine whether the ALJ's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Pierce v. Underwood, 587 U.S. 552 (1988). "Substantial evidence is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005). It is relevant evidence viewed objectively as adequate to support a decision. Richardson v. Perales, 402 U.S. 389, 401 (1971); Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979). In determining whether substantial evidence exists, the reviewing court may not weigh the evidence or substitute its own conclusion for that of the ALJ.

Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  If the court determines the ALJ's factual findings are supported by substantial evidence, then the court must accept the findings as conclusive.  Richardson, 402 U.S. at 390; Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  It is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence.  Richardson, 402 U.S. at 401.  While the Third Circuit Court of Appeals has made it clear that the ALJ must analyze all relevant evidence in the record and provide an explanation for disregarding evidence, this requirement does not mandate the ALJ "to use particular language or adhere to a particular format in conducting his analysis." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).  Rather, it is meant "to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Id.  Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards.  Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

To establish a disability under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  Stunkard v. Sec'y of Health and Human Servs., 841 F.2d 57 (3d Cir. 1988) (quoting Kangas, 823 F.2d at 777); 42 U.S.C. § 423(d)(1) (1982).  The claimant satisfies his burden by showing an inability to return to his past relevant work.  Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979) (citing Baker v. Gardner, 362 F.2d 864 (3d Cir. 1966)).  Once this showing is made, the burden of proof shifts to the Commissioner to show that the claimant, given his age, education, and work experience, has the ability to perform specific jobs that exist in the economy.  See 20 C.F.R. § 404.1520; Rossi, 602 F.2d at 57.

As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

(i) At the first step, we consider your work activity if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (references to other regulations omitted).

## II.    ADMINISTRATIVE LAW JUDGE'S DECISION

Pursuant to the five-step sequential evaluation process, the ALJ determined plaintiff had not been under a "disability," as defined by the Act, from October 5, 2015, the alleged onset date, through the date of the ALJ's decision.  (Tr. 29).

At step one, the ALJ found plaintiff had not engaged in substantial gainful activity since October 5, 2015, the alleged onset date.  (Tr. 17).

At step two, the ALJ found plaintiff had the following severe impairments: history of right ankle fracture with subsequent osteoarthritis and reflect sympathetic dystrophy syndrome (RSDS); history of left hip fracture/dislocation; opiate dependence with opiate- induced mood disorder; anxiety disorder NOS; and depressive disorder NOS/major depressive disorder.  (Tr. 17).  In making this determination, the ALJ reviewed and relied on plaintiff's medical records. The following medical records are relevant to the issues at bar:

On October 5, 2015, plaintiff's alleged disability onset date, plaintiff fell twenty-five feet off a lift and landed on a coworker.  (Tr. 429-50, 527-49).  Plaintiff presented with severe left hip pain, chest pain, a head laceration, and a brief loss of consciousness at the scene. Id.  Plaintiff was distressed and his pain was 10/10, but he was oriented in three spheres.  Id.  A urine toxicology screening revealed that plaintiff tested positive for marijuana, opiates, and cocaine.  Id.  An x-ray of the pelvis showed superior dislocation of the left hip with small calcific fragments present adjacent to the femoral head (with a reduction of the dislocation visible in a later x-ray).  Id.  A pelvis CT revealed a posterior and superior dislocation of the left femoral head.  Id.  The posterior of the acetabulum fractured with fragments lying between the femoral head and iliac wing.  Id.  An x-ray of the right foot showed a comminuted fracture through the calcaneus, extending up into the subtler articulation (with no dislocation and an uncollapsed calcaneus).  Id.  A spine CT revealed mild facet degenerative changes on L5-S1 and a congenital limbus vertebral body but no evidence of dislocation or fracture.  Id.  A head CT was unremarkable excepting a small frontal scalp hematoma.  Id.  Plaintiff was subsequently diagnosed with a left closed hip dislocation, a scalp laceration, and a concussion.  Id.

On October 6, 2015, an x-ray of plaintiff's right ankle confirmed that he had a "markedly comminuted acute fracture of the calcaneus" with ankle "mortise joint asymmetry consistent with lateral ligamentous injury[,] tiny fibular avulsion fractures[, and a] tiny osseous fragment between the talus and posterior facet of the calcaneus."  (Tr. 524).  Plaintiff remained at the hospital until October 10, 2015, during which time he had significant pain and was treated with oxycodone, fentanyl, and morphine, but did demonstrate progress.  (Tr. 450-92).

On October 10, 2015, plaintiff's pain was well-controlled by oxycodone and he was discharged to a rehab hospital.  (Tr. 427).  On October 13, after plaintiff reported increasing left rib pain, a CAT scan revealed a left ninth rib fracture.  (Tr. 424-26).  On October 16, plaintiff reported that the Oxycontin and Oxycodone partially took care of his foot and hip pain, but his range of motion was painful.  (Tr. 423).  On November 5, he was discharged home from the rehab hospital.  (Tr. 427).

Between November 11, 2015, and February 5, 2016, plaintiff attended twenty-three days of physical, occupational, and speech therapy appointments.  (Tr. 365-638).  At these appointments, plaintiff continuously reported left hip and right ankle/foot pain and intermittently reported rib pain.  Id.  His pain reports varied between 0/10 and 10/10, but usually ranged between a 5/10 and an 8/10.  Id.  Plaintiff was diagnosed with gait dysfunction and functional limitations as a result of weight bearing limitations.  Id.  Plaintiff also reported cognitive difficulties in the areas of attention and retention, headaches, difficulty sleeping, anxiety, and drug use.  Id.  Plaintiff was able to complete therapeutic exercises such as meal prep and folding clothes and reported that at home he was able to bathe himself, dress himself, and do some light homemaking.  Id.  Plaintiff's ambulation distance increased, and memory abilities improved in

therapy.  Id.  Plaintiff was first able to ambulate in a wheelchair, then progressed to ambulating

with a rolling walker.  Id.

At ten appointments between November 20, 2015 and March 18, 2016, with Dr.

Frank Essis at the Orthopedic Associates of Lancaster, Dr. Keri Lavigne-Langenstein at

Lancaster General Health Physical Medicine and Rehab, and Dr. Luke Bingamin at Southeast

Lancaster Health, plaintiff continued to report constant foot and hip pain.  (Tr. 394, 383, 365,

411, 631, 614, 623, 644-46).  Plaintiff continued to heal, and an x-ray of his right calcaneus

revealed "healing minimally displaced calcanea fracture without loss of reduction or

complication," while an x-ray of his left hip showed "concentrically reduced left hip without

change, there is a slight fragmentation very small lip fracture posterior shows healing."  (Tr. 383,

502).  Plaintiff's laceration also healed.  (Tr. 411).  Plaintiff reported anxiety and an inability to

sleep.  (Tr. 384, 644-45).  Plaintiff was taking several medications, including, gabatentin,

oxycontin, lidocaine, enoxaparin sodium, sertraline, lorazepam, and oxcodone.  (Tr. 617).  By

January 29, 2016, Dr. Essis reported, "at this point he can become weight-bearing as tolerated

and wean off the walker as well as walk without the boot" and transferred plaintiff to a cane.  (Tr.

645, 646).  An x-ray of his pelvis and left hip showed a completely healed posterior acetabular

rim fracture without displacement.  (Tr. 652-53).  An x-ray of his right calcaneus showed a

completely healed calcanea fracture without significant loss of reduction.  (Tr. 653).

There is a gap in medical records for about eleven months, until a Pennsylvania

Department of Labor Clinical Psychology Disability Evaluation by Dr. Jennifer Richards on

February 15, 2017.  (Tr. 663).  Plaintiff reported that he lived with his wife, one-year old child,

and three-month-old child.  Id.  In terms of daily functions, he was able to bathe himself with a

shower chair, dress himself (except socks and shoes), use the microwave, make sandwiches, go to church three times a week, and walk with neighbors, but did not clean, do laundry, shop, drive, or take public transportation.  (Tr. 666).  Plaintiff had the following mental symptoms: dysphoric mood, crying spells, hopelessness, loss of energy, worthlessness, diminished self- esteem, concentration difficulties, and diminished sense of pleasure, apprehension, worry, and difficulty concentrating, short-term memory deficits, a difficult time concentrating, and nausea when reading.  (Tr. 664).  Dr. Richards diagnosed plaintiff with major depressive disorder and unspecified anxiety disorder and filled out a Medical Source Statement, in which she noted that, due to plaintiff's cognitive difficulties and severe depression, he would have some moderate and marked mental limitations.  (Tr. 666-70).

On March 29, 2017, plaintiff was evaluated by Dr. Ahmed Kneifati, MD.  (Tr. 673).  Dr. Kneifati noted that plaintiff arrived with a cane and had a widened gait with a limp.  (Tr. 673-74).  Plaintiff had poor balance, even with his cane, and could not walk without the cane.  (Tr. 674).  Plaintiff could not stand on toes and heels even with the cane, and could only squat 40%.  Id.  Plaintiff was able to get off a chair without help but needed assistance to get off a table.  Id.  Plaintiff had sharp 8/10 pain in his left hip, which worsened upon bending but improved with rest.  (Tr. 673).  Plaintiff's ankle had constant sharp 10/10 pain. Plaintiff had some jerky motion of his muscles and difficulty with speech due to his concussion but had no difficulty with his healed ribs.  Id.

Plaintiff was "somewhat emotional and stressed."  (Tr. 674).  In his daily life, plaintiff did cook, but received help from his wife on all other activities, including dressing and showering.  Id.  Plaintiff stated that he smoked cigarettes but did not use alcohol or drugs.  Id.

Plaintiff currently took Zoloft, Ativan, Morphine, Oxycodone, Gabapentin, Tramadol, Flexeril, and Lidocaine cream every day, and received steroids every five months. (Tr. 673). Plaintiff had 20/20 vision. (Tr. 674). He had no evidence of joint deformity except some swelling around the right ankle and tenderness of the mediolateral right ankle joint. (Tr. 675). Dr. Kneifati diagnosed plaintiff with a left hip dislocation, right ankle fracture, head concussion with difficulty in speech with some jerky motion, anxiety, bipolar disorder, and a fractured rib which healed without any difficulties. (Tr. 676). The prognosis was fair. Id.

Dr. Kneifati also filled out a medical source statement in which he noted that plaintiff had several limitations due to his left hip, right ankle, head injury, and poor balance. (Tr. 677-78). Plaintiff could occasionally lift or carry up to twenty-one pounds, but never over that. (Tr. 677). Plaintiff could sit for two hours at a time but could only stand or walk for twenty minutes at a time. Id. In total, plaintiff could sit for up to five hours of a workday, stand for up to two hours of a workday, and walk for up to two hours of a workday. (Tr. 678). Plaintiff medically required a cane to walk but could carry items with his free hand. Id. Plaintiff had no limitations on his left or right hand and could use them both continuously. (Tr. 679). Plaintiff could use his left foot for controls continuously but could only use his right foot occasionally. Id. Plaintiff could occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl, but could never balance or climb ladders or scaffolds. Id. Plaintiff's hearing and vision were not impaired. (Tr. 680). Plaintiff could never tolerate unprotected heights but could occasionally tolerate operating a motor vehicle and moving mechanical parts, and could frequently tolerate humidity, wetness, dust, odor, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations. (Tr. 681). Plaintiff could tolerate loud noise. Id. Plaintiff could perform activities

like shopping; ambulating without a wheelchair, walker, or two canes or crutches; walking a

block at a reasonable pace on rough or uneven surfaces; using standard public transportation;

climbing a few steps at a reasonable pace with a hand rail; preparing a simple meal; caring for

personal hygiene; and sorting, handling, or using paper and files.  Id.  However, plaintiff could

not travel without a companion for assistance.  Id.  All these limitations had lasted or would last

for twelve consecutive months.  (Tr. 682).

On April 12, 2017, plaintiff's prior medical records were examined by

consultative examiner Dr. David P. Clark.  (Tr. 85-100).  Based on these records, Dr. Clark

completed a recommended residual functional capacity evaluation limiting plaintiff's exertions

due to continuing issues caused by his right ankle fracture and left hip fracture.  (Tr. 93).

Plaintiff determined that plaintiff could occasionally lift or carry twenty pounds, could frequently

lift or carry ten pounds, could stand or walk for six hours of an eight hour work day, could sit for

six hours of an eight hour workday, and could push or pull with his hands and feet an unlimited

amount.  (Tr. 92).  Plaintiff could frequently climb ramps and stairs, balance, stoop, and crouch;

occasionally kneel and crawl; and never climb ladders, ropes, or scaffolds.  (Tr. 93).  Plaintiff

should avoid concentrated exposure to extreme heat, cold, wetness, humidity, vibrations, and

hazard, but could tolerate noise, fumes, and odors.  Id.  Plaintiff's statements appeared partially

consistent with the totality of the medical evidence, but there was insufficient evidence to prove

any disability because plaintiff failed to schedule a consultative examination.  (Tr. 95).

Plaintiff's records were also considered by Dr. Steven Timchack, PsyD, who

determined that despite moderate limitations due to depressive and anxiety disorders, plaintiff

would be able to complete competitive tasks on a sustained basis.  (Tr. 96-98).

At appointments with his primary care physician Dr. Adrinne Kuhlengel at Twin Rose between November 20, 2017, and April 27, 2018, plaintiff reported pain in his right ankle and left hip, and anxiety.  (Tr. 744, 748-49, 751).  Plaintiff's right ankle displayed a decreased range of motion and swelling at lateral malleolus.  (Tr. 750).  On April 27, 2018, Dr. Kuhlengel completed a Pennsylvania Department of Human Services Medical Assessment Form for plaintiff, indicating that plaintiff was disabled since October 5, 2015, and listing plaintiff's diagnoses as chronic pain in the left hip, chronic pain in the right foot from reflex sympathetic dystrophy, and a memory deficit resulting from his traumatic brain injury.  (Tr. 837-38).  On that same day, Dr. Kuhlengel told plaintiff that plaintiff would no longer be prescribed oxycodone, as plaintiff continuously violated his Drug Agreement by repeatedly testing positive for marijuana, despite denying any marijuana use.  (Tr. 745-46, 749-50, 752, 753, 784-86, 816).

At appointments with new primary care physicians Dr. Thomas Coyne and Dr. Benjamin Snell at Twin Rose on May 4, May 18, May 30, June 4, June 6, June 13, and June 19, 2018, plaintiff continued to present with ankle pain, anxiety, anxiety attacks, and depression.  (Tr. 792, 794, 802-03, 844-45, 853, 865, 874-76).  Plaintiff tested positive for marijuana use several times and was diagnosed with opioid dependence with opioid-induced mood disorder.  (Tr. 794-98, 805, 811, 815, 818-21, 826).

After examinations by Dr. David Sieger in orthopedics at OAL Willow Street on September 22, 2017, October 10, 2017, and May 3, 2018, plaintiff was diagnosed with subtler orthosis following his calcanea fracture and scheduled for right subtler fusion with an infusion graft surgery.  (Tr. 714, 716).  Plaintiff reported depression, anxiety, and memory loss and ankle pain with a "quite exaggerated" pain response.  (Tr. 759).  Plaintiff's surgery was cancelled on

May 22, 2018, after plaintiff displayed an inability to quit cigarettes and marijuana.  (Tr. 757-59, 769).

On July 11, 2018, plaintiff testified before an ALJ that he still had constant pain in his left hip and right ankle and required a cane to walk.  (Tr. 67).  Plaintiff could stand for twenty minutes without needing a twenty-minute rest, could sit for fifteen to twenty minutes, and could walk one block without stopping to rest for twenty minutes.  (Tr. 42-53, 65-69).  The ALJ noted that plaintiff needed to shift between sitting and standing several times during the hearing.  (Tr. 68).  Plaintiff reported less pain when he lay in bed, and two days a week, he stayed in bed the entire day.  (Tr. 69).  Plaintiff could lift items under ten pounds such as a gallon of milk or bag of bread and eggs.  Id.  Plaintiff could play with his kids in a limited fashion, such as pushing balls around.  (Tr. 66).  Plaintiff could do dishes but required his wife's presence and required his wife's help to put on shoes, and sometimes to go to the bathroom.  (Tr. 66, 70).  Plaintiff could pick up food from drive-throughs but could not clean his car.  (Tr. 66).

Plaintiff also reported memory issues; for example, he often left his keys around the house.  (Tr. 61).  Plaintiff had bad headaches, but only from time to time, and still felt nausea when trying to read little words.  (Tr. 61, 67).  Plaintiff suffered from depression, but medication made it better.  (Tr. 62).  When Plaintiff forgot to take his medication, he was moody and prone to anxiety.  (Tr. 63-64).  Plaintiff described his anxiety as periods where he was constantly jumpy, could not breathe, had a rapid heart rate, and felt as if he was going to die.  (Tr. 64).  Plaintiff suffered from nightmares about his accident three times a week and was sometimes tearful.  (Tr. 66, 70).

Plaintiff reported he was required to see a psychiatrist before getting ankle fusion surgery.  (Tr. 55).  Plaintiff also was required to get blood testing before surgery but forgot to do so.  (Tr. 56, 59).

Plaintiff's medications gabapentin and Naprosyn were "working pretty good" and "helping a lot."  (Tr. 54).  However, plaintiff was experiencing side effects of shivering and over sweating.  Id.  Plaintiff was also taking suboxone (to get off oxycodone) and sertraline.  (Tr. 55).

Plaintiff claimed to have quit smoking the day before the hearing but had not tried nicotine patches yet.  (Tr. 56).  Plaintiff admitted that when he told his surgeon that he quit smoking "that didn't happen, your honor. I never stopped, your honor."  (Tr. 56-57).  Plaintiff claimed that the last time he smoked marijuana was the previous month.  (Tr. 57).  Plaintiff claimed to have only used it once because it helped with pain, and it was procured illegally. (Tr. 57-58).

On appointments at his primary care physician between July 17, 2018, and October 19, 2018, plaintiff reported severe ankle pain, anxiety, depression, short term memory problems, and a fixation on UFOs, and he was observed to have an antalgic gait.  (Tr. 879, 882-83, 889 892-94, 897, 907).  Plaintiff tested positive for marijuana several times and cocaine once. (Tr. 911, 923).  Plaintiff was angered by his inability to take opioids, as he felt they controlled his pain.  (Tr. 892).  Plaintiff deferred a referral to physical therapy on July 24.  (Tr. 885).

In his final testimony before the ALJ on December 20, 2018, plaintiff noted that he was still on suboxone.  (Tr. 38).  Plaintiff claimed to have stopped taking marijuana less than three weeks ago, admitting that before that time, he was taking it once a week.  Id.  Plaintiff reported that he spent a great deal of time staring outside and although he had been fascinated by

UFOs since he was little, he had been afraid of them for a year and a half.  (Tr. 40-41).  Plaintiff

stated that his chipped hip sometimes got stuck.  (Tr. 41).  Plaintiff declined physical therapy.

(Tr. 39).  Plaintiff's medication stabilized his panic attacks; without the medication, he would

have two panic attacks a month.  (Tr. 42).  Plaintiff's doctor had not yet approved him for

surgery.  (Tr. 43).  The record was left open for sixty days for updates, but no updates were

submitted.  (Tr. 44).

    Over the course of his treatments, plaintiff's BMI was measured as: 25.9 kg/m$^2$ on

October 5, 2015, 25.9 on October 8, 2015, 29.86 on January 13, 2016, 29.19 on September 22,

2017, 30.47 on November 20, 2017, 31.4 on December 18, 2017, 30.17 on January 24, 2018,

30.94 on April 2, 2018, 30.59 on April 27, 2018, 29.85 on May 4, 2018, 30.03 on May 18, 2018,

29.16 on May 22, 2018, 29.95 on May 30, 2018, 30.17 on June 4, 2018, 29.89 on June 6, 2018,

30.79 on June 13, 2018, 30.32 on June 19, 2018, 30.7 on July 17, 2018, 30.82 on July 24, 2018,

30.46 on July 31, 2018, 29.8 on August 9, 2018, 29.98 on August 14, 2018, 30.41 on September

4, 2018, 31.17 on September 5, 2018, and 31.84 on October 19, 2018.  (Tr. 465, 448, 615, 716,

750, 752, 754, 745, 785, 793, 802, 758, 845, 866, 875, 882, 884, 888, 891, 895, 897, 900, 920).

    Continuing with the five-step sequential evaluation, at step three, the ALJ found

plaintiff did not have an impairment or combination of impairments that met or medically

equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 18).

    At step four, the ALJ found plaintiff had the residual functional capacity to

perform a range of sedentary work, except he:

> would require the use of a cane when ambulating; would require the option to
> alternate sitting and standing every twenty minutes, at the work station without
> change in rate of production; occasionally climb ramps and stairs, balance, stoop,

kneel, crouch, crawl, with "occasional" defined as up to one- third of the workday; no climbing ladders, ropes or scaffolding; no concentrated exposure to extreme heat or cold, wetness, humidity, or vibration; no exposure to unprotected height or dangerous equipment; limited to routine, repetitive tasks involving one- and two-step instructions; occasional public interaction; occasional interaction with coworkers and supervisors; and limited to production-oriented type jobs with little independent decision-making.

(Tr. 20).  The ALJ determined that while plaintiff has medically determinable impairments that could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence for the reasons that are set forth in the ALJ's decision.  (Tr. 21).

Finally, at step five, the ALJ determined plaintiff is unable to perform any past relevant work.  (Tr. 26).  However, the ALJ also determined that there are jobs that exist in significant numbers in the national economy that plaintiff can perform, such as a final assembler of optical goods, a dowel inspector, or a carding machine operator.  (Tr. 27).  Thus, the ALJ determined plaintiff had not been under a "disability," as defined in the Act, since October 5, 2015, through the date of the decision.  (Tr. 28).

## III.    PLAINTIFF'S CONTENTIONS

Plaintiff argues that the ALJ erred at step two by analyzing the severity of plaintiff's obesity under an incorrect legal standard.  Pl. Brief at 1.  Plaintiff also argues that the ALJ erred by failing to include sitting, standing, and walking limitations in the residential functional capacity assessment, despite a medical consensus to do so.  Id.

**IV.     DISCUSSION**

The ALJ's findings must be affirmed if they are supported by substantial evidence.  42 U.S.C. § 405(g); Richardson, 402 U.S. at 401.  The role of this court is to determine whether substantial evidence supports the ALJ's decision.  Williams v. Sullivan, 970 F. 2d 1178, 1182 (3d Cir. 1992).  In coming to a decision, it is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence.  Richardson, 402 U.S. at 401.  A reviewing court "should not re-weigh the medical opinions of record but should consider only whether the ALJ's weighing of such opinions was supported by substantial evidence."  Hatton v. Comm'r of Soc. Sec., 131 F. App'x 877, 880 (3d Cir. 2005).

After a review of the record, we find that the ALJ's decisions were supported by substantial evidence.

**1.  Whether the ALJ erred at step two in determining that plaintiff's obesity was not a severe impairment.**

Plaintiff first argues that the ALJ's finding in step two—that plaintiff's obesity was not a severe impairment—was erroneous.  Pl. Brief at 4.  Plaintiff argues that the ALJ used the wrong legal standard in assessing his obesity, and as a result, every subsequent step was affected.  Id.  Defendant counters that the ALJ's ruling was proper, as plaintiff never claimed a severe impairment of obesity, plaintiff's medical records did not demonstrate any negative effects of plaintiff's weight on his functioning, and plaintiff's fluctuating BMI pointed to no

continuous period of severe obesity.  Def. Response at 7.  We agree with defendant that the ALJ's decision with respect to obesity was supported by substantial evidence.

Social Security Ruling (SSR) 02-1p guides our obesity disability analysis.[1] Plaintiff correctly states that an ALJ should "do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe" rather than find obesity "severe" or "not severe" based on weight or BMI alone.  SSR 02-1p.  Obesity is severe when the record demonstrates that, alone or combined with other impairments, "it significantly limits an individual's physical or mental ability to do basic work activities," while it is not severe if it "is a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities."  Id.

Thus, in Rutherford v. Barnhart, the Third Circuit ruled that even though a claimant was 245 pounds and 5'2" (and therefore in the morbidly obese range), the ALJ was not required to identify obesity as a severe impairment in in the claimant's social security case, because the claimant:

> never mentioned obesity as a condition that contributed to her inability to work, even when asked directly by the ALJ to describe her impairments [and never] specified how that factor would affect the five-step analysis undertaken by the ALJ, beyond an assertion that her weight makes it more difficult for her to stand, walk and manipulate her hands and fingers. That generalized response is not enough to require a remand, particularly when the administrative record indicates clearly that the ALJ relied on the voluminous medical evidence as a basis for his findings regarding her limitations and impairments.

399 F.3d 546, 553 (3d Cir. 2005); see also Thorne v. Colvin, No. CIV.A. 13-2139, 2015 WL 3498642, at *6 (E.D. Pa. June 3, 2015) (holding that the court should not remand an ALJ's

---

[1] Although SSR 19-2p replaced 02-1p in 2019 as the current authority on this matter, all applications filed prior to 2019, including the present one, must continue to follow 02-1p.  SSR 19-2p, 2019 WL 2374244 at *1-2, 5 n.14.

decision "based on the failure to confront evidence that does not exist" when the plaintiff did not point to any evidence in the record that showed obesity impacted her symptoms); see also Santiago v. Barnhart, 367 F. Supp. 2d 728, 734 (E.D. Pa. 2005) (holding that when plaintiff failed to allege obesity as a disability in his application or hearing, and failed to point to any evidence that his obesity exacerbated his impairments, the ALJ's failure to mention obesity was not a basis to remand); see also Rodriguez v. Astrue, No. 10-CV-3203, 2012 WL 5494659, at *13 (E.D. Pa. Apr. 2, 2012), report and recommendation adopted, No. CIV.A. 10-3203, 2012 WL 5503425 (E.D. Pa. Nov. 13, 2012) (noting that even if a plaintiff had a BMI supporting obesity, there should be no remand when "the plaintiff has failed to allege obesity as a basis for disability and the record does not support any obesity-related work limitation.").

In the present case, the record fails to demonstrate that obesity acted as a severe impairment in plaintiff's life or significantly affected any other impairment.  Plaintiff's case is analogous to Rutherford in that plaintiff never put obesity in his application, and, more importantly, never subsequently brought it up as an impairment throughout the social security process.[2]  Plaintiff did not mention obesity or any obesity symptoms at either of his hearings before the ALJ; the record similarly demonstrates that plaintiff never brought up obesity or its effects to any of his health care providers.  The only references to obesity in plaintiff's medical records are the standard file BMI measurements that occur along with any patient's height and weight.  Thus, despite plaintiff's claim that the ALJ failed to consider the "totality of the

---

[2] Plaintiff's argument that his case is more analogous to Peters v. Colvin, Civ. A. No. 25-cv-04750 at * 9 (E.D. Pa. Aug. 17, 2016), and Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009), is mistaken, as both of those cases featured an ALJ who found that the claimant's obesity was a severe impairment at step two, then went on to err at later steps.  These feature an entirely different scenario than the case here, where the ALJ held that the evidence failed to demonstrate that plaintiff's obesity was a severe impairment at all.

evidence," and only focused on the plaintiff's low BMI, plaintiff failed to demonstrate just what obesity evidence the ALJ should have considered, as the record, and plaintiff, provided none.  Pl. Reply at 2.  The ALJ brought up obesity in his decision sua sponte, and determined that the only obesity information provided—plaintiff's BMI— was not consistently high enough to indicate a severe impairment.

In considering an individual's obesity for social security disability purposes, SSR 02-1p states that, "in most cases, the BMI will show whether the individual has obesity."  02-1p. For example, a BMI between 25 and 29.9 indicates that an individual is merely overweight, while a BMI between 30 and 34.9 indicates that an individual suffers from the lowest level of obesity.  SSR 02-1p, 2002 WL 628049, at *2 (Sept. 12, 2002) (citing Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (NIH Publication No. 98-4083, September 1998)).

To be a severe impairment, an applicant's obesity must have lasted or be expected to last at least twelve months.  SSR 02-1p (stating "[a]s with all impairments, to establish a finding of disability based on obesity, in whole or in part, the statutory duration requirement must be satisfied."); 20 CFR 404.1509 (defining the duration requirement, along with 20 CFR 416.909, to require a "a continuous period of at least twelve months"); see Edinger v. Saul, No. CV 18-1001, 2020 WL 93932, at *4 (E.D. Pa. Jan. 7, 2020) (noting that step two of the disability analysis requires a disorder to withstand the duration requirement).

Accordingly, when a claimant's BMI consistently jumps between overweight and obese, substantial evidence supports an ALJ determination that the claimant is not obese.  See Rodriguez v. Astrue, No. 10-CV-3203, 2012 WL 5494659, at *13 (E.D. Pa. Apr. 2, 2012), report

and recommendation adopted, No. CIV.A. 10-3203, 2012 WL 5503425 (E.D. Pa. Nov. 13, 2012)

(supporting the ALJ's finding that obesity was not a severe impairment when the claimant's BMI

only sometimes reached the obese category).

In finding plaintiff's obesity to be a medically determinable but not a severe

impairment, the ALJ in the present case stated:

> [O]besity is sporadically noted during the period at issue, as the claimant's Body
> Mass Index (BMI) has risen above 30, but his BMI has also been below 30, such
> that there is no continuous twelve-month period of BMI in the range consistent
> with obesity to date (see Ex. 1F-4F, 8F, 10F-17F). As such, the undersigned finds
> these disorders, while medically determinable, did not persist for twelve
> continuous months and therefore cannot be considered severe impairments (20
> CFR 404.1509 and 416.909).

(Tr. at 17).

In plaintiff's case, the ALJ properly found that obesity was not a severe

impairment. In the various medical records provided, plaintiff's BMI was measured as:

25.9 kg/m$^2$ on October 5, 2015, 25.9 on October 8, 2015, 29.86 on January 13, 2016, 29.19 on

September 22, 2017, 30.47 on November 20, 2017, 31.4 on December 18, 2017, 30.17 on

January 24, 2018, 30.94 on April 2, 2018, 30.59 on April 27, 2018, 29.85 on May 4, 2018, 30.03

on May 18, 2018, 29.16 on May 22, 2018, 29.95 on May 30, 2018, 30.17 on June 4, 2018, 29.89

on June 6, 2018, 30.79 on June 13, 2018, 30.32 on June 19, 2018, 30.7 on July 17, 2018, 30.82

on July 24, 2018, 30.46 on July 31, 2018, 29.8 on August 9, 2018, 29.98 on August 14, 2018,

30.41 on September 4, 2018, 31.17 on September 5, 2018, and 31.84 on October 19, 2018. (Tr.

465, 448, 615, 716, 750, 752, 754, 745, 785, 793, 802, 758, 845, 866, 875, 882, 884, 888, 891,

895, 897, 900, 920).  As these measurements indicate, plaintiff consistently wavered back and

forth between being categorized as "the lowest level of obese" or merely overweight.  Plaintiff

has not met the duration requirement here, as he has failed to demonstrate that he was obese for a continuous period of at least twelve months.

As there was no other evidence indicating that plaintiff's obesity affected his functioning or ability to do basic work activities, we find that the ALJ properly determined that obesity was not a severe impairment.[3]

## 2. Whether the ALJ's RFC was supported by substantial evidence.

Next, plaintiff asserts that the ALJ's Residual Functional Capacity (RFC) assessment of plaintiff "cannot be supported by substantial evidence as it ostensibly rejects all medical opinions of record in violation of Doak v. Heckler." Pl. Brief at 6 (discussing 790 F.2d 26, 29 (3d Cir. 1986)). Plaintiff argues that the ALJ failed to include standing and walking limitations in his RFC, despite recommendations by Dr. Ahmed Kneifati and Dr. David Clark to include these limitations. Id.; Pl. Reply at 4. However, plaintiff appeared to miss several key facts, including that the ALJ did clearly include standing and walking limitations, and that the ALJ followed Dr. Kneifati's advice in fashioning those limitations (and in doing so was more generous to plaintiff than would have occurred by following Dr. Clark). We find that plaintiff's argument should be dismissed.

Plaintiff was examined by consultative examiner Dr. Kneifati on March 29, 2017. (Tr. 676). Dr. Kneifati noted that plaintiff arrived with a cane and had a widened gait with a limp. (Tr. 673-74). Plaintiff had poor balance, even with his cane, and could not walk without the cane. (Tr. 674). Plaintiff could not stand on toes and heels even with the cane and could only

---

[3] As the ALJ properly determined in Step Two that obesity was not relevant in this calculation, there was no need to revisit the obesity analysis in later steps. See Rutherford v. Barnhart, 399 F.3d 546, 552–53 (3d Cir. 2005) ("When the ALJ determines that obesity, either alone or in concert with other conditions, is not a relevant factor, there is no requirement that an ALJ repeat this determination throughout each step of the sequential analysis."); (Tr. 17).

squat 40%.  (Tr. 674).  Plaintiff was able to get off a chair without help but needed assistance to

get off a table.  Id.  Based on the above observations, Dr. Kneifati opined that plaintiff could sit

for two hours at a time but could only stand or walk for twenty minutes at a time. (Tr. 678). In

total, plaintiff could sit for five hours in a workday, stand for two hours in a work day, and walk

for two hours in a work day.[4]  Id.  Plaintiff also required a cane to walk.  Id.

   The ALJ afforded "significant but slightly limited weight" to Dr. Kneifati's

opinion, praising the doctor's suggested exertional and non-exertional limitations and noting that

Dr. Kneifati's findings were generally supportive of his RFC.  (Tr. 24).  The ALJ limited the

weight given to Dr. Kneifati's opinion only "to the extent Dr. Kneifati suggested slightly greater

or slightly lesser limitations than ultimately found by the undersigned," as "greater deference

was afforded to the objective medical evidence itself, no part of which was available for Dr.

Kneifati to review when he rendered his 'snapshot' type opinion."  Id.

   On April 12, 2017, state agency physician Dr. Clark examined plaintiff's records

and determined that plaintiff could stand and/or walk (with normal breaks) for a total of about six

hours in an eight-hour workday.  (Tr. 92).  Plaintiff could sit (with normal breaks) for a total of

about six hours in an eight-hour workday.  Id.  Plaintiff could also occasionally kneel, and

frequently balance and crouch.  (Tr. 93).

   The ALJ afforded Dr. Clark's opinion "limited weight only to the extent it is

consistent with the . . . [RFC] assessment."  (Tr. 25).  This was because "substantial medical

---

[4] In claiming Dr. Kneifati limited plaintiff to "standing/walking two hours total in an eight-hour workday," plaintiff is misrepresenting the facts, as Dr. Kneifati addressed standing and walking separately.  See Pl. Reply at 4; (Tr. 678).

evidence received after the opinion was rendered suggested that slightly greater limitations are more appropriate in this case (see Ex. 9F-17F)."[5] Id.

When the ALJ made his RFC determination after considering all the available evidence, the ALJ determined that the claimant:

> has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: would require the use of a cane when ambulating; would require the option to alternate sitting and standing every twenty minutes, at the workstation without change in rate of production. . .

(Tr. 20).[6]

Evidently, the ALJ took Dr. Kneifati's suggestion to limit the plaintiff to no more than four hours of standing and walking in an eight-hour workday, passing over Dr. Clark's harsher assessment which would have had plaintiff standing and walking for up to six hours in one day.  Plaintiff's argument that the ALJ ignored the expert opinions when it came to standing and walking limitations is therefore plainly mistaken.

As a final note, even if the ALJ had not followed the advice of either physician, plaintiff's argument would still fail.  Plaintiff represents that Doak v. Heckler, 790 F.2d 26 (3d Cir. 1986) "stands for the proposition that an RFC crafted by an ALJ is not supported by substantial evidence if medical opinions of functionality are present and none support the ALJ's finding."  Plaintiff argues Doak requires this court to remand the ALJ's finding if it does not conform to a medical opinion.  Pl. Brief at 8.  However, plaintiff misinterprets Doak, as

---

[5] The ALJ continued to receive subsequent medical records for almost two years after Dr. Kneifati and Dr. Clark issued their opinions.  (Tr. 44-45, 357-58).

[6] Even if the ALJ had not included the option for plaintiff to alternate sitting and standing, his RFC evaluation that could perform "sedentary work" alone would defeat plaintiff's argument that the ALJ included no sitting or standing limitations.  This is because the very definition of sedentary work includes standing and walking restrictions.  See CFR § 404.1567; CFR § 404.1567; SSR 83-10; SSR 96-9p.

"Doak does not stand for the proposition that an ALJ cannot make an RFC determination in the absence of a medical opinion reaching the same conclusion [;]. . . an ALJ is not restricted to adopting the conclusions of a medical opinion in making an RFC determination." Cleinow v. Berryhill, 311 F. Supp. 3d 683, 685–86 (E.D. Pa. 2018).  In fact, the Third Circuit has emphasized that the "ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.  See 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c)." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011).  Even if the ALJ disagreed with both Dr. Kneifati and Dr. Clark, the ALJ's RFC would still stand as long as the explanation for rejection was properly supported by the record.

However, in the present case, as the ALJ's assessment both includes walking and standing limitations and is entirely supported by Dr. Kneifati's opinion (which is more generous to plaintiff than Dr. Clark's opinion), we reject plaintiff's argument and find that the ALJ's RFC assessment is supported by substantial evidence.

**CONCLUSION**

AND NOW, this 30th day of April, 2020, IT IS ORDERED that the plaintiff's request for review is **DENIED.**  This case shall be marked CLOSED forthwith.

BY THE COURT:

 /s/ LINDA K. CARACAPPA
LINDA K. CARACAPPA
UNITED STATES MAGISTRATE JUDGE